**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **PATRICIA BRINKMAN** ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 12 C 1397 |
| ) | |
| v. ) | Magistrate Judge Daniel G. Martin |
| ) | |
| **MICHAEL J. ASTRUE** ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Patricia Brinkman ("Plaintiff" or "Brinkman") seeks judicial review of a final decision of Defendant Michael J. Astrue, the Commissioner of Social Security ("Commissioner"). The Commissioner denied Plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") under Title II of the Social Security Act, and Brinkman filed a Motion for Summary Judgment. The parties have consented to have this Court conduct all proceedings in this case, including an entry of final judgment. 28 U.S.C. § 636(e); N.D. Ill. R. 73.1(c). For the reasons stated below, Plaintiff's motion is denied.

**I. Legal Standard**

**A. The Social Security Administration Standard**

In order to qualify for DIB, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. See 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings"). The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations. See 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional capacity to work. The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. Id. If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not disabled if he can do work that is available under this standard. 20 C.F.R. §

2

404.1520(a)(4)(v).

**B. Standard of Review**

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## II. Background Facts

**A.    Medical History**

Brinkman was diagnosed with discoid lupus erthyematosus ("DLE") as early as June 1993, when cutaneous rashes were noticed on her face and hands. (R. 395). DLE "is a

set of skin changes that can occur as part of lupus, with or without systemic involvement." The Merck Manual 269 (18th ed., 2006). The record is unclear on what treatment steps she took after her 1993 diagnosis other than taking an oral steroid to alleviate her rashes. A treatment note dated April 21, 1999 states that Brinkman had been encouraged to see a specialist for her condition, but the record is not clear whether she did so at that time. (R. 377). By March 2002, treating physician Dr. Evan Geissler noted that Brinkman had lupus sun rashes and advised her to wear a protective sunscreen. (R. 373).

A treatment note in October 2005 by Dr. Kevin Joyce states that Brinkman had consulted two rheumatologists about her lupus and had been treated with courses of oral corticosteroids and topical creams. (R. 299). Dr. Joyce, who was seeing Brinkman due to swelling in her legs, stated that it was "possible" that her lupus had become systemic. However, little evidence supported a finding of "active lupus" at that time. (R. 300-01). Nevertheless, Dr. Joyce ordered two antibody tests that are used to diagnose lupus, an antinuclear antibody test ("ANA") and an anti-La antibody test ("SSB"). The results showed that Brinkman's ANA and SSB levels were both 296, significantly over the high normal range of 99. (R. 314).

The record is not clear on what course of treatment Brinkman underwent immediately after these tests. Brinkman told Dr. Joyce on October 27, 2009 that she had discontinued topical treatments for her lupus and that she managed her condition by avoiding exposure to the sun. (R. 299). Blood tests performed earlier in September 2009 indicated an abnormal level of ANA antibodies, and the report states that Brinkman was again encouraged to consult a rheumatologist. (R. 405). A treatment note dated November 2009 also states that she was referred to a specialist for lupus. (R. 565). A

February 2010 progress note completed by a medical assistant indicates that Brinkman did consult a rheumatologist, though the physician's name is not clear from the record. (R. 425). Brinkman continued to see her rheumatologist throughout 2010 and early 2011, and tests showed that her antibodies remained in the high level. (R. 571-79). She was prescribed Plaquenil to treat her condition. (R. 626).

Brinkman's physical discomfort was enhanced during this period by joint pain stemming from her arthritis. An x-ray of her left hand on September 24, 2009 indicated normal joint structures with smooth cortical margins. (R. 418). A follow-up x-ray in February 2010 showed only "minimal degenerative changes" in each of Brinkman's hands and "unremarkable" changes in her spine. (R. 440, 442). A treatment note states that she was taking 10mg daily of prednisone, though it is not clear if that oral steroid was prescribed for her lupus, arthritis, or for both conditions. (R. 574).

Brinkman was also treated for a variety of other physical and emotional conditions, though there are few records for these treatments. Tests performed in May 2004 showed that her thyroid stimulating hormone ("TSH") level was 12.85, more than double the maximum normal range of 4.67, and a thyroid nuclear scan was ordered in June 2004. (R. 349, 351). She was diagnosed with thyroiditis and placed on the synthetic hormone Synthroid by April 2009. (R. 539, 566). Thyroid tests done in February 2010 also suggested continued high TSH levels. (R. 526-27).

As the ALJ noted, Brinkman also suffered from high blood pressure and was treated with the medication Lisinopril. In addition, she was treated for depression from at least 2004 and was prescribed various antidepressant medications, particularly Zoloft. (R. 172, 353, 566). The Court notes that the record concerning Brinkman's mental health treatment

is sparse, and at times she denied feeling depressed. (R. 459).

B. **Consulting and Examining Physicians**

The record contains the reports of several physicians who either examined Brinkman or reviewed her records in order to determine the extent of her physical and mental impairments.

1. **Dr. Muhammad Rafiq**

On June 5, 2010, internal medicine specialist Dr. Muhammad Rafiq examined Brinkman in LaGrange, Illinois. Brinkman told Dr. Rafiq that she required at least two naps a day and experienced pain throughout her body. Notwithstanding, she also reported that she could sit up to one hour, lift up to ten pounds, and stand for thirty minutes at a time. Dr. Rafiq noted a lupus-related rash on her face, arms, and legs. He also found that Brinkman could walk more than fifty feet without support and had a normal range of motion in her shoulders, hips, knees, lumbar spine, and ankles. She had a normal ability to grasp and grip with both hands. Dr. Rafiq noted that Brinkman was obese and weighed 194 pounds with a height of under five feet and five inches. He stated that Brinkman showed no signs of depression at the examination, but Dr. Rafiq included depression as one of her disorders, together with lupus, hypothyroidism, osteoarthritis, hypertension, dyslipidemia, and CREST syndrome.[1] (R. 468-71).

2. **Dr. Alan Jacobs**

Brinckman was also examined by psychologist Dr. Alan Jacobs on the same day as

---

[1] CREST syndrome is a limited cutaneous form of systemic scleroderma that involves changes in the skin, blood vessels, muscles, and internal organs. *See* The Merck Manuel 270 (18th ed. 2006).

6

she saw Dr. Rafiq. Dr. Jacobs noted that Brinkman had not received "formalized mental health treatment" for her depression, although she was currently taking the antidepressant medication Sertraline. Brinkman stated that her symptoms ebbed and flowed and that she believed her depression was associated, at least in part, with her lupus. Dr. Jacobs noted that she displayed some self-consciousness about her lupus-related skin rashes. After consulting with her, Dr. Jacobs diagnosed Brinkman as suffering from major depression associated with her lupus and hypothyroidism, bereavement, and anxiety. (R. 474-76).

### 3. Dr. Virgilio Pilapil

On June 18, 2010, Dr. Virgilio Pilapil issued a physical RFC assessment for the SSA. Dr. Pilapil found that Brinkman could work at the medium exertional level and had the ability to lift fifty pounds occasionally and twenty-five pounds frequently. She could sit, stand, and walk for up to six hours during a workday and had an unlimited capacity to push and pull. Nevertheless, Dr. Pilapil did impose some non-exertional limits on her RFC. These include findings that she could only occasionally climb stairs and should never be required to balance due to obesity and hypertension. (R. 486-93).

### 4. Dr. Lionel Hudspeth

The record also contains a Psychiatric Review Technique ("PRT") assessment issued by Dr. Lionel Hudspeth on July 6, 2010. Dr. Hudspeth found that Brinkman suffered from a major depressive disorder and anxiety. Under the Paragraph B criteria of Listing 12.04, he found that she had mild limitations in her activities of daily living and social functioning, a moderate limitation in concentration, persistence, and pace, but that she had not experienced any episodes of decompensation. No Paragraph C criteria were met. Dr.

7

Hudspeth then assessed Brinkman's mental RFC by finding that she had moderate limitations in her ability to accept instructions, set realistic goals, maintain attention, and perform activities within a regular schedule. All other functional areas were found not to be significantly limited. (R. 494-510).

### C. Hearing Testimony

Brinkman testified at the June 29, 2011 hearing that she was forty-two years old and lived with her husband and five-year old son. (R. 35). She last worked as a receptionist for an insurance company from 1997 through 2004, when she left her job due to pain and stress. (R. 37-41). Brinkman described her physical condition as including spasms in her legs while driving, swelling in her feet, headaches, and skin rashes from her lupus. She treats the pain in her feet with the medication Tramadol and various over-the-counter pain relievers. (R. 42). Brinkman also stated that she must frequently stay indoors because of her depression. (R. 43, 47).

Brinkman described her daily life as involving small tasks such as watching television, engaging in activities with her son, and napping in the afternoon. (R. 46). Her husband helps with cooking and laundry, and her mother assists in caring for her child when Brinkman's symptoms prevent her from doing so. (R. 46-47). Brinkman testified that she can stand for thirty minutes and is only able to walk a few blocks without experiencing back pain. She can sit for up to an hour at a time and is able to lift no more than a gallon of milk. (R. 48-49).

Vocational expert ("VE") Lee Knutson also testified at the hearing. The ALJ posed six hypothetical questions to the VE about Brinkman's ability to work. She first asked the VE to assume a person limited to light work who also had a number of non-exertional

8

limitations.  These included a limited ability to climb stairs, and the capacity to perform only routine tasks with simple instructions.  The VE responded that a substantial number of jobs existed that could be performed by a person with such a RFC.  The ALJ then asked the VE to assume a person limited to sedentary work.  Again, the VE stated that work existed for such a person.

Finally, the ALJ proposed four variations for a person who could only perform light work.  The first involved a claimant limited to frequent but not constant bilateral fingering.  The VE found that work was available for such a person.  When bilateral fingering was reduced from frequent to occasional, the VE responded that it would eliminate the jobs he earlier identified if the restriction involved a claimant's dominant hand.  However, jobs at the sedentary level would be available.  Third, if the additional limitation of fatigue were added, the VE stated that no work could be performed.  Finally, if a person needed to be off task for thirty percent of the time, the VE again stated that work would not be available. (R. 54-60).

### D. The ALJ's Decision

ALJ Sayon issued a written decision on August 23, 2011 and found that Brinkman was not disabled.  She determined at Step 1 that Brinkman had not engaged in substantial work since her alleged onset date of June 1, 2004. (R. 15).  At Step 2, the ALJ found that Brinkman's severe impairments included lupus, hypothyroidism, hypertension, osteoarthritis, obesity, depression, and anxiety.  (R. 16).  Brinkman's lupus and osteoarthritis did not meet or medically equal a Listing at Step 3.  (*Id*.).  The ALJ also applied at Step 3 the "special technique" required under 20 C.F.R. § 1520(a) for assessing the severity of mental disorders.  She determined that Brown had mild restrictions in her

9

activities of daily living and social functioning, together with a moderate restriction in her concentration, persistence, and pace. (R. 16-17). No episodes of decompensation existed, and the ALJ found that no Paragraph C criteria had been met. (R. 17).

Before moving to Step 4, the ALJ reviewed the medical record and Brinkman's testimony in order to assess her RFC. With the exception noted below, the ALJ found that Brinkman's statements about the limitations imposed by her symptoms were not credible. Her RFC was assessed at light work with a variety of exertional and non-exertional limitations. (R. 17-18). The ALJ then determined at Step 4 that Brown could not perform her past relevant work. (R. 22). Based on the testimony of the VE, the ALJ concluded at Step 5 that a substantial number of jobs existed in the national economy that Brinkman could perform and that, as a result, she was "not disabled." (R. 23-24).

### III. Discussion

Brinkman challenges the ALJ's decision on three grounds. She argues that the ALJ erred by: (1) finding at Step 3 that her lupus did not meet or medically equal Listing 14.02 (systemic lupus erthyematosus); (2) finding that her statements were not credible; and (3) not properly considering her RFC. The Court addresses each of these arguments in turn.

### A.  Substantial Evidence Supports the ALJ's Step 3 Finding

Systemic lupus erthyematosus is "a chronic inflammatory disease that can affect any organ or body system," including an individual's respiratory, cardiovascular, renal, blood, skin, neurologic, mental, or immune systems. 20 C.F.R. Pt. 404, Subpt. P, App. 1 at § 14.00D1. Listing 14.02 states that a claimant can meet or medically equal the requirements for SLE by demonstrating the existence of lupus accompanied by the:

10

A. Involvement of two or more organs/body systems, with:

1. One of the organs/body systems involved to at least a moderate level of severity; and

2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

or

B. Repeated manifestations of SLE, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:

1. Limitation of activities of daily living.

2. Limitations in maintaining social functioning.

3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1 at § 14.02.

The Court agrees with the Commissioner that substantial evidence supports the ALJ's finding that Brinkman did not meet or medically equal either of these alternatives. Listing 14.02A requires a claimant to show two things. She must first demonstrate that two of her organs or body systems are moderately affected by SLE. Brinkman does not address this point fully, but the record suggests that she met these criteria. Several treating sources stated that Brinkman suffered from lupus-related skin rashes, and examining psychologist Dr. Jacobs concluded that her depression was "associated with lupus/hypothyroidism." (R. 476).

However, the record does not show that Brinkman satisfied Listing 14.02A's second requirement that she suffer from at least two of the constitutional symptoms identified in the Listing as severe fatigue, fever, malaise, or involuntary weight loss. Brinkman again

11

does not address how the record relates to this portion of Listing 14.02A, but she argues in other portions of her motion that she suffered from significant fatigue. Even if this were sufficient to meet the fatigue element of Listing 14.02A.2, the record does not show that Brinkman suffered from one of the other listed symptoms of malaise, fever, or involuntary weight loss. Brinkman points out that her anitbody counts were elevated at times, but antibody counts are not part of Listing 14.02A's criteria. She also claims that a person with SLE should be expected to have the symptoms identified in Listing 14.02. *See* Doc. 16 at 12. Having a disorder, however, does not mean that a claimant necessarily experiences all the symptoms that could be associated with it. *See Boyd v. Astrue*, No. 09 C 1217, 2009 WL 5149136, at *9 (N.D. Ill. Dec. 28, 2009) ("[A] condition that can cause certain symptoms does not mean that the condition has caused those symptoms in a particular case."). A claimant always bears the burden of showing that the evidence supporting her condition meets or equals the criteria of a specific Listing. *Maggard v. Apfel*, 167 F.3d 376, 379-80 (7th Cir. 1999).

The record also fails to show how Brinkman can meet or medically equal Listing 14.02B. That Listing again contains two-prongs. First, Brinkman must show two of the constitutional symptoms like fatigue and fever, and she has not done so. Second, she must demonstrate that she has a "marked" limitation in at least one of the functional areas of activities of daily living, social functioning, or concentration. Brinkman does not challenge the ALJ's findings as part of the special technique that she only experienced "mild" limitations in the first two categories and had a "moderate" restriction in her concentration. (R. 16-17). Brinkman claims in other parts of her motion that she has "severe" limitations in her activities of daily living, but she fails to identify any part of the

12

record that supports this claim. In particular, Brinkman fails to address that Dr. Hudspeth's PRT reached the same conclusions as the ALJ concerning her daily life, social functioning, and concentration. In the absence of any argument on why the ALJ's findings fail to properly account for the medical evidence, Brinkman has not shown how the record could support a conclusion that she meets the requirements of Listing 14.02A or 14.02B. The Motion for Summary Judgment is denied on the Listing issue.

### B. Substantial Evidence Supports the ALJ's Credibility Assessment

Brinkman next argues that the ALJ erred in finding that her statements concerning the limiting effects of her symptoms were not credible. If an ALJ finds that a medical impairment exists that could be expected to produce a claimant's alleged condition, he must then assess how the individual's symptoms affect his ability to work. SSR 96-7p. The fact that a claimant's subjective complaints are not fully substantiated by the record is not a sufficient reason to find that he is not credible. The ALJ must consider the entire record and "build an accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, any aggravating factors, the types of treatment received, any medications taken, and functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. A court reviews an ALJ's credibility decision with deference and overturns it only when the assessment is patently wrong. *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

Brinkman presents a limited credibility argument that relies primarily on a comment

13

the ALJ made at Step 1. The ALJ noted that a 2005 treatment note from Dr. Kevin Joyce stated that "she is continuing to work as a bartender," but that Brinkman had testified at the hearing that she worked as a bartender for only two days in 2005. (R. 15, 37, 300). The ALJ speculated that "'continuing to work' sounds more like an ongoing job, as opposed to a two-day attempt at work." (R. 16). The ALJ then stated that the apparent contradiction between Brinkman's testimony and Dr. Joyce's comment would be considered in her credibility assessment. (*Id*.). Brinkman argues that the ALJ was not entitled to discount her credibility due solely to Dr. Joyce's use of the word "continuing."

The Court agrees that the ALJ laid undue stress on Dr. Joyce's note, which appears to be little more than a passing comment the physician made while interviewing Brinkman. However, Brinkman overstates the ALJ's reliance on the note to reach her credibility decision. The ALJ did not find Brinkman's testimony to be non-credible based only on Dr. Joyce's comment, and she considered many of the factors required by SSR 96-7p. The relevant question is whether substantial evidence supports the ALJ's finding based on her discussion of those factors.

The ALJ gave considerable attention to the objective medical record, including the results of Brinkman's x-rays and blood tests, and Brinkman fails to challenge many of her key findings. The ALJ noted, for example, that x-rays of Brinkman's joints showed only minimal degenerative changes, that her treating physician found little evidence of active lupus, and that Brinkman had discontinued lupus treatment altogether at one point and considered it to be inactive. (R. 21). The ALJ also reviewed Brinkman's tests and medical consultations in detail and concluded that both her physical and mental treatment histories were inconsistent with Brinkman's allegations of severe limitations. In particular, the ALJ

stated that the record did not provide evidence of the pain or mental distress that Brinkman alleged had caused her to stop working in 2004.

Brinkman also fails to challenge the ALJ's finding that her pain-related claims were inconsistent with comments she made to her doctors. The ALJ noted that Brinkman did not report any pain in May and September 2009. (R. 19). She claimed a pain level of 5 out of 10 on November 12, 2009, but once again stated that her pain was at a 0 level only ten days later. (R. 19, 456, 458). In early February 2010, Brinkman stated that her pain was an 8 or 9 out of 10, but it was at the 0 level once more by February 26, 2010. (R. 19).

Brinkman briefly attempts to support her credibility by pointing out that 20 C.F.R. § 404.1529 requires a medical condition to exist that could be expected to produce a claimant's symptoms. Social Security Ruling 96-7p elaborates on this requirement by stating:

> [O]nce an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p. The basis of Brinkman's reliance on this provision to support her credibility is unclear. She appears to be arguing that, because she was diagnosed with lupus and arthritis, all of her pain-related allegations should be construed as credible because they are the "expected" consequences of her conditions.

The Court finds this reasoning unpersuasive. As noted above, the existence of a

15

medical condition does not mean that all of a claimant's pain allegations must be accepted as true. Social Security Ruling 96-7p makes clear that a credibility assessment is required only after a medical condition is established. That does not mean, however, that all "expected" symptoms of a condition will always be present in a particular case, or that a claimant's allegations must be taken as true just because she has a specific medical condition. If Brinkman's claim were correct, the ALJ's credibility assessment would not be necessary at all because Brinkman's diagnosed conditions would themselves verify her claims. That is clearly not the case, and the ALJ properly turned to the requirements for assessing credibility under SSR 96-7p once she determined that Brinkman suffered from medical conditions that could reasonably be expected to give rise to her symptoms.

Part of this analysis was based on the ALJ's consideration of Brinkman's activities of daily living. As discussed above, Brinkman fails to address the basis for the ALJ's conclusion that she only experienced mild limitations in this functional area. The ALJ also considered the side effects of Brinkman's medications to some degree. She noted that Brinkman took oral and topical corticosteroids for lupus-related rashes; Wellbutrin, Zoloft, and Effexor for depression; Methotrexate for headaches; and Ultram for foot pain.[2] The ALJ noted that Brinkman experiences nausea from both Methotrexate and steroids. (R. 18). Brinkman objects that the ALJ did not consider all the side effects of her medications, but remand is not required just because the ALJ did not discuss every aspect of her medication in full. *See Clay v. Apfel*, 64 F. Supp.2d 774, 781 (N.D. Ill. 1999) (stating that an ALJ is not necessarily required to discuss all of the seven credibility factors, even

---

[2] The ALJ failed to note that Brinkman took Synthroid for her thyroiditis and took Lisinopril to control her blood pressure.

though she is obligated to "consider" them).

Finally, Brinkman contends that the ALJ failed by not considering her testimony that she often feels tired and is required to take naps during the day. This argument fails on several grounds. It is not true that the ALJ rejected Brinkman's claims out of hand, as she states. To the contrary, the ALJ explicitly restricted the RFC to "routine" work with no exposure to heights because Brinikman "testified that she is always tired." (R. 22). The ALJ also did not fail to take account of Brinkman's testimony on this issue. The ALJ considered the complaints of fatigue Brinkman made to her consulting physicians, her testimony at the hearing, and even statements about tiredness that Brinkman made as early as 2003. (R. 18-22). The ALJ simply did not find that Brinkman's fatigue was as severe as she alleged. Brinkman claims that the ALJ failed to consider that the combined effect of her many medications was "likely" to cause this tiredness. (Doc. 16 at 12). However, Brinkman did not testify that she was tired because of her medicine, and she has not cited any evidence on what effects could result from a combination of her medications.

The Court recognizes that the ALJ's credibility discussion is not without flaws. She could have discussed the reasons for her decision in greater detail and should have provided a more thorough explanation of her reasoning. However, the Court cannot say that the ALJ's credibility assessment as a whole is patently incorrect. Brinkman's motion is denied on the credibility issue.

### C. Substantial Evidence Supports the RFC

Finally, Brinkman argues that the ALJ's hypothetical question to the VE at Step 5 was flawed because it failed to include limitations that would have reduced her RFC from the light exertional level to the less onerous level of sedentary work. As discussed earlier,

17

the ALJ posed an initial question to the VE that reflected Brinkman's RFC. She then added increasingly restrictive limitations to this hypothetical. Brinkman cites several of these restrictions, including the ability to handle and finger objects, the need to take naps, and the possibility that she might need to be off-task for portions of each day. Brinkman appears to claim that if the RFC had included these extra limitations, the ALJ would have been required to find her disabled.[3]

Brinkman fails to cite any part of the record that supports her claim that the ALJ should have accommodated her fatigue more than limiting her to routine work without exposure to heights. The Court has carefully reviewed the record and finds that substantial evidence supports the ALJ's finding that Brinkman did not need extensive work breaks. Dr. Hudspeth found that she had "moderate" restrictions in persistence and pace and had no significant limitations in the ability "to perform at a consistent pace without an unreasonable number and length of rest periods." (R. 504, 509). Dr. Pilapil's physical RFC determined that Brinkman could perform work at the medium exertional level and could sit, stand, and walk for up to six hours a day with only normal breaks. (R. 487). The RFC did not include any finding that Brinkman needed additional break periods during the workday. As for her ability to handle objects, Dr. Pilapil found that Brinkman had no manipulative limitations, including both gross and fine manipulation. (R. 489).

---

[3] The exact nature of Brinkman's claim is not clear. She appears to be contesting the RFC assessment itself, not the ALJ's Step 5 decision. *See Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) (noting that claimant's "contention that at Step 5 the ALJ constructed a hypothetical built around a flawed RFC adds nothing to her challenge to the RFC"). The Commissioner interprets Brinkman's argument in this manner, and she does not state otherwise in the reply brief. In the absence of any argument to the contrary, the Court agrees with the Commissioner that Brinkman's primary concern is whether the ALJ should have included the additional restrictions she identifies as part of the RFC.

Brinkman has not challenged these findings or argued that the ALJ erred by relying on these conclusions to reach her RFC. As a result, Brinkman has not shown why the RFC should have included additional limitations concerning fingering, handling, and rest periods. Brinkman's motion is denied on this issue.

## IV. Conclusion

For these reasons, the Court denies Brinkman's Motion for Summary Judgment [16] and affirms the Commissioner's final decision. The case is closed.

**ENTERED:**

**_____**
**DANIEL G. MARTIN**
**United States Magistrate Judge**

Dated: January 9, 2013